**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

UNITED STATES OF AMERICA :
:
:
v. : CRIMINAL NO. 3:05CR121 (MRK)
:
:
WAYNE DAVENPORT :

**MEMORANDUM OF DECISION**

Defendant Wayne Davenport is charged in an Indictment [doc. #1] with being a felon in possession of a firearm and ammunition in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2). Mr. Davenport moves to suppress the Smith & Wesson .45 caliber handgun that he discarded when fleeing from police on January 1, 2005, the eight rounds of ammunition found in the handgun, and the round of ammunition found on Mr. Davenport as he was arrested. Motion to Suppress Evidence [doc. #21]. Mr. Davenport argues that police lacked sufficient cause to chase him, and that an officer effected a "de facto arrest" when grabbing Mr. Davenport in an unsuccessful attempt to stop his flight. After considering the parties' arguments, and after hearing testimony and receiving evidence at a hearing held on November 1, the Court DENIES Mr. Davenport's Motion to Suppress Evidence [doc. #21].

**I.**

The facts relevant to the Motion to Suppress are as follows. On January 1, 2005, at about 9 p.m., police received a 911 call from a citizen reporting an assault and purse snatching in front of People's Bank at the corner of North Avenue and Park Avenue in Bridgeport, an area known for robberies and purse snatching during the holiday season. *See* Compact Disk of Computer Aided

Dispatch Recordings, Government Exhibit 1 [hereinafter CAD Recordings] at File 1; Hearing Transcript at 6. The caller noted that the victim was "in hysterics," bleeding, and in need of an ambulance. CAD Recordings at File 1. The caller identified two black males as the perpetrators and said they had fled east on North Avenue by foot. *Id.* The dispatch officer who took the 911 call over the Computer Aided Dispatch (CAD) system, in which emergency calls are received and then relayed to police officers at relevant posts, sent out a radio alert to Bridgeport officers near the scene. *Id.* at File 2. Several officers were dispatched to the area. Medical personnel were also dispatched, as the victim was reported to have been thrown to the ground and to be bleeding. *Id.* at File 3.

Officers who arrived at the crime scene spoke to witnesses, including the victim, who was bleeding profusely and who informed police that the man who had taken her purse used a knife. According to Officer Jersey, who testified at the suppression hearing, the victim was visibly distraught and crying. Officers attempted to get a description of the assailants, but because the victim spoke Spanish and little or no English, they called for a Spanish-speaking officer. A witness described one of the assailants as a black male, in his thirties, wearing a black jacket, who fled east up North Avenue. *Id.* at File 11. No description of the second suspect was available at that time.

One of the officers who heard the initial CAD report of the purse snatching and proceeded to the crime scene was Ilidio Pereira. Officer Pereira testified at the suppression hearing that at some point he learned that one of the purse snatchers had a knife, though he was not certain whether he learned this information at the crime scene from fellow officers, via his cell phone, or from a radio broadcast.[1] Hr'g Tr. at 57-58. Officer Pereira began patrolling the area around North Avenue and

[1] Officer Pereira initially testified at the hearing that he learned of the knife through a radio broadcast, but then admitted that he could not recall whether he learned of it over the radio, via his cell phone, or from another officer. Hr'g Tr. at 57-58. None of the conversations on the CAD

Park Avenue in his marked police cruiser, looking for anybody matching the descriptions of the suspects.

Once a Spanish-speaking officer arrived at the scene, he spoke with the victim. According to Officer Jersey, the victim told police that as she was walking westbound on North Avenue in the vicinity of the People's Bank, she heard people running up from behind her. When she turned around, she saw two black males, one of whom was wearing a gray camouflage T-shirt, black jacket, and black jeans. *Id.* at 20. This individual grabbed her purse, which was on her shoulder, and while the victim held onto the purse, the assailant pulled out a knife and slashed at the strap, cutting it off and at the same time cutting the victim's hand. *Id.* While this occurred, the other suspect stood by watching. According to the victim, the assailants then ran off eastbound on North Avenue. *Id.* Officer Jersey said that the victim's account was corroborated by what he found at the scene – the victim's wound, a large blood splatter on the sidewalk, and a leather purse strap lying on the pavement. *Id.* at 15. At the evidentiary hearing, the victim testified that the assailants appeared to be sixteen- or seventeen-year-old minors, *id.* at 98, but this description was never relayed over the police radio.

At approximately 9:30 p.m., an officer relayed over the radio a description of the second suspect as "about thirty years old, heavy set, with a beard . . . should have a grey army fatigue jacket on . . . black knit cap . . . beard, heavy set, between 5' 9" and 5' 10"." The dispatcher repeated this description over the dispatch system. CAD Recordings at File 20. Officer Pereira testified that he recalled hearing the dispatcher describe the second suspect as a black male in his 30s, heavy set,

---

recordings mentions a knife. Regardless of the source of his knowledge, however, Officer Pereira's testimony that he knew one of the purse snatchers had a knife was uncontradicted and credible.

wearing black clothing and a grey army fatigue shirt, about 6' 0". Hr'g Tr. at 58. In his Incident Report, written late on the night of January 1 after Mr. Davenport had been arrested, Officer Pereira wrote that he recalled hearing a description of the second suspect as "wearing a black jacket, grey army fatigue shirt and a black hat." Gov't Ex. 5, at 2.

Just after 9:30 p.m., Officer Pereira returned to the People's Bank area. As he was traveling north on Park Avenue, he observed a black male walking across the People's Bank parking lot, where the purse snatching had occurred. Because the parking lot was well lit, and because he had an unobstructed view, Officer Pereira saw the man clearly. Hr'g Tr. at 76-77. Officer Pereira testified at the hearing that the man was in his late twenties or early thirties, between 5' 10" and 6' 2", wearing a black jacket and a grey army fatigue shirt, *id.* at 61, a description consistent with the one Officer Pereira later provided in his police report, Gov't Ex. 5, at 2. At the suppression hearing and in his report, Officer Pereira noted that the man looked suspicious and was glancing around and peering into the bank, even though it was closed. Hr'g Tr. at 61-62; Gov't Ex. 5, at 2. Officer Pereira testified that he made these observations before the man saw his marked police cruiser. Hr'g Tr. at 61-62. According to Officer Pereira, when the man finally saw the police car, "he appeared very nervous and hesitant," and "he was walking back and forth, side to side as if though [sic] he felt cornered." Gov't Ex. 5, at 2. His suspicions raised by the man's strange behavior and by the fact that the man appeared to match the description Officer Pereira recalled hearing over the radio, Officer Pereira radioed to dispatch to repeat the suspect descriptions. An officer responded that "one was a black male, black . . . leather jacket . . . the second one, black male, grey army fatigue jacket, beard, heavy set . . . both around the same age, thirty-ish." CAD Recordings at File 21.

Officer Pereira decided to speak with the man, later identified as Defendant Wayne

Davenport, because he believed the man matched the description of one of the assailants, the man was in the vicinity of the purse snatching, and he was acting suspiciously. Officer Pereira radioed dispatch that he was "going to be out with a party in front of People's Bank," and exiting his vehicle, he started walking towards Mr. Davenport. As Officer Pereira approached him, Mr. Davenport began shying away, and so Officer Pereira said in a loud manner, "Come here." Gov't Ex. 5, at 2. According to Officer Pereira, Mr. Davenport heard the officer's command. Hr'g Tr. at 63. Nevertheless, Mr. Davenport immediately took off, running away from Officer Pereira. Officer Pereira chased after him and advised dispatch and other officers over his radio that "we got foot pursuit." CAD Recordings at File 21.

Officer Pereira chased Mr. Davenport "south on Park Ave., west onto Beech Wood [sic] Ave. and then . . . ran through the side yard of 25 Beech Wood [sic] Ave., never losing sight of Davenport . . . ." Gov't Ex. 5, at 2-3. On the dispatch recordings, Officer Pereira can be heard advising fellow officers of the pursuit and his location. When he got to the side yard on Beechwood Ave., Mr. Davenport attempted to climb a wooden fence lining the yard, but Officer Pereira grabbed Mr. Davenport's left leg and the back of his jacket, attempting to pull him off the fence. *Id.* at 3. As he was holding Mr. Davenport's jacket, Officer Pereira also began to climb the fence, and as he did so, the wooden fence broke, causing both Officer Pereira and Mr. Davenport to fall to the ground. Officer Pereira got back up and at the same time saw Mr. Davenport "remove a black handgun from his waist band and jump a small fence," heading into a yard on Iranistan Ave. *Id.*

Officer Pereira advised other officers over the radio that Mr. Davenport was crossing Iranistan Ave and that "he's got a weapon in his waistband." CAD Recordings at File 22. Officer Pereira observed Mr. Davenport throw the gun to the ground as he was running away and heard "a

sound which is consist[e]nt with metal hitting cement." Gov't Ex. 5, at 3. Officer Pereira then jumped the small fence himself and continued the chase across the yard and onto Iranistan Ave. There, several officers, including Officer Pereira, finally caught Mr. Davenport. When they did, they handcuffed him and took him into custody. *Id.* at 3-4. During a search of Mr. Davenport's person conducted at the time of the arrest, police found a live round of .45 caliber ammunition in the front right pocket of his pants. *Id.* at 4.

Officer Pereira returned to the rear yard on Iranistan Ave. and found the handgun that he had seen Mr. Davenport discard during the chase. The gun was warm despite the cold temperature outside, consistent with Officer Pereira's statement that the gun had been in Mr. Davenport's waistband. *Id.* On the gun, Officer Pereira noticed a "reddish/orange marking," "possibly from the cement bricks located in the rear of [the property] where Davenport . . . tossed the weapon and . . . consitant [sic] with the sound I heard of metal hitting cement at the time when Davenport threw the hand gun to the ground." *Id.* at 6. The .45 caliber handgun, along with seven bullets in the gun's magazine and a live round in its chamber,[2] were taken into evidence by police. *Id.* at 4.

Mr. Davenport was indicted on one count of being a felon in possession of a firearm and ammunition in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2). Indictment [doc. #1]. He now moves to suppress the gun and ammunition found on the night of January 1. Motion to Suppress Evidence [doc. #21]. The Court held an evidentiary hearing on November 1, confining the scope

---

[2] The precise number of bullets in the magazine is not made explicit in Officer Pereira's report. Officer Pereira describes removing the gun's magazine, but he does not say how many bullets he found there. *Id.* at 4. Later in his report, Officer Pereira lists as evidence seized "one magazine with (9) nine 45 auto caliber rounds." *Id.* at 5. Since nine bullets total were seized, and one was found in the chamber and one on Mr. Davenport's person, the Court assumes that the magazine contained seven at the time police first obtained the gun.

of the hearing to the issue of what Officer Pereira knew prior to grabbing Mr. Davenport at the fence, as that was the only issue on which the Court concluded Mr. Davenport – who did not submit an affidavit along with his motion to suppress – was entitled to an evidentiary hearing.[3] The Court also requested and received supplemental briefing from the parties. *See* Government's Post-Hearing Brief in Opposition to Motion to Suppress [doc. #50]; Defendant's Post-Hearing Memorandum in Support of Motion to Suppress [doc. #51].

**II.**

**A. The Discarded Handgun and Ammunition**

The first issue for the Court is whether Officer Pereira had sufficient cause to detain Mr. Davenport at the fence after Mr. Davenport had fled from the officer in the bank parking lot. The reason why this is the first relevant point of focus for the Court's inquiry is because at no time before the scuffle at the fence did Officer Pereira conduct a seizure of Mr. Davenport for purposes of the Fourth Amendment. *See, e.g.*, *California v. Hodari D.*, 499 U.S. 621, 626-29 (1991) (holding that a suspect who ran away from police was not "seized" within the meaning of the Fourth Amendment because he did not submit to the officers chasing him); *Florida v. Royer*, 460 U.S. 491, 497 (1983) (plurality opinion) ("[L]aw enforcement officers do not violate the Fourth Amendment by merely approaching an individual on the street or in another public place . . . . Nor would the fact that the officer identifies himself as a police officer, without more, convert the encounter into a seizure requiring some level of objective justification."). Wisely, Mr. Davenport does not claim otherwise.

[3] The Court's decision to hold an evidentiary hearing in the absence of an affidavit from Mr. Davenport was largely prompted by the Defendant's identification of inconsistencies between the suspect descriptions in the CAD recordings and those in Officer Pereira's report. At no point did Mr. Davenport allege any inaccuracies in Officer Pereira's report relating to events taking place after Mr. Davenport's flight from Officer Pereira began.

As the Supreme Court in *Hodari D* put it, "The word 'seizure' . . . does not remotely apply . . . to the prospect of a policeman yelling 'Stop, in the name of the law!' at a fleeing form that continues to flee. That is no seizure." *Hodari D*, 499 U.S. at 626; *see United States v. Swindle*, 407 F.3d 562, 572 (2d Cir. 2005) ("A police pursuit in attempting to seize a person does not amount to a 'seizure' within the meaning of the Fourth Amendment." (internal quotation marks omitted)); *United States v. Vargas*, 369 F.3d 98, 102 (2d Cir. 2004) ("[The defendant's] freedom clearly was not restrained, considering the fact that he fled after the officers asked to speak to him.").

Mr. Davenport claims that what happened at the fence was an unlawful seizure, and that all evidence found thereafter must be suppressed as the fruits of that illegal seizure. The Government disputes this claim, but in the alternative argues that Mr. Davenport abandoned any expectation of privacy he might have had in the gun or the ammunition when he discarded them after Officer Pereira had sought to detain Mr. Davenport at the fence. The Court need not consider the Government's alternative argument regarding abandonment, because the Court finds that Officer Pereira's actions at the fence were lawful, and therefore the gun and the ammunition inside it are not the fruits of an illegal seizure.

Under *Terry v. Ohio*, 392 U.S. 1 (1968), "a police officer may briefly seize someone and conduct a limited search for weapons if the officer reasonably suspects the person of being involved in criminal activity." *Swindle*, 407 F.3d at 563 n.2. Such a warrantless "*Terry* stop" is permitted where the officer can articulate "at least a minimal level of objective justification for making the stop." *Illinois v. Wardlow*, 528 U.S. 119, 123 (2000). In evaluating the officer's justification, the relevant question is: "would the facts available to the officer at the moment of the seizure or the search warrant a man of reasonable caution in the belief that the action taken was appropriate?"

*Terry*, 392 U.S. at 21-22 (internal quotation marks omitted); *United States v. Thomas*, 363 F. Supp. 2d 84, 91 (D. Conn. 2005).

In *Terry*, a police officer stopped and frisked a man whom he had observed, along with two others, pacing suspiciously and peering in through a store window. *Terry*, 392 U.S. at 5-7. The Supreme Court found that the officer's actions did not violate the Fourth Amendment because of the "legitimate investigative function" the officer was performing, the suspicious behavior of the suspects, and the officer's justified suspicion that the suspects might be armed. *Id.* at 23-24. Taken together, these factors justified the officer in briefly detaining the suspects "to determine whether the [suspects were] in fact carrying a weapon and to neutralize the threat of physical harm." *Id.* at 24.

In the present case, Officer Pereira had a "'particularized and objective basis' for suspecting legal wrongdoing" when he sought to detain Mr. Davenport at the fence. *Swindle*, 407 F.3d at 570 (quoting *United States v. Arvizu,* 534 US 266, 273 (2002)). First, Mr. Davenport nearly perfectly matched the description of the second suspect provided on the CAD broadcasts.[4] An early broadcast described the second suspect as a black male, "about thirty years old, heavy set, with a beard . . . [with] a grey army fatigue jacket on . . . black knit cap . . . beard, heavy set, between 5' 9" and 5' 10"." CAD Recordings at File 11. Upon seeing Mr. Davenport at the People's Bank parking lot, Officer Pereira requested and received a repeated suspect description, which identified him as a "black male, grey army fatigue jacket, beard, heavy set . . . thirty-ish." *Id.* at File 21. These descriptions strongly resemble the "black male . . . wearing a black jacket . . . grey/black/white army

---

[4] At the suppression hearing, the victim testified that the purse snatchers were sixteen- or seventeen-year-old minors. However, there is no dispute that this information was never relayed over the radio, and as a consequence, it does not bear on what Officer Pereira knew at the time he sought to detain Mr. Davenport or on his justification for doing so.

fatigue shirt, heavy set," between 5' 10" and 6' 2" and in his early thirties, that Officer Pereira reported and testified to having seen in the parking lot. Gov't Ex. 5, at 2. Moreover, Mr. Davenport's presence near the scene of the purse snatching only a short time after it occurred further substantiates the inference that he was in some way connected to it. Because Officer Pereira was aware that at least one of the suspects involved in the purse snatching had used a knife (and was presumably still armed with it), the close match between the second suspect and Mr. Davenport alerted Officer Pereira to the possibility that Mr. Davenport might pose a threat to individuals in the area. *See United States v. Newton*, 369 F.3d 659, 674 (2d Cir. 2004) ("[W]here an officer has a reasonable basis to think that the person stopped poses a present physical threat to the officer or others, the Fourth Amendment permits the officer to take 'necessary measures . . . to neutralize the threat . . . .'" (quoting *Terry*, 392 U.S. at 24)).

Second, and equally important, Officer Pereira reported that Mr. Davenport was acting suspiciously, glancing around and looking into the bank. Mr. Davenport also grew nervous when he saw Officer Pereira's marked police cruiser, pacing back and forth in a cagey manner. Like the suspicious pacing in *Terry*, this behavior of Mr. Davenport's suggested that "criminal activity [was] afoot." *Terry*, 392 U.S. at 30; *see Wardlow*, 528 U.S. at 124 (noting that "nervous, evasive behavior is a pertinent factor in determining reasonable suspicion" for a *Terry* stop).

Finally, Mr. Davenport fled when Officer Pereira told him to "Come here."[5] As the Supreme

[5] The Government cites a recent Second Circuit opinion for the proposition that a court may consider events occurring after police unreasonably order a suspect to stop but before they seize him in determining whether the seizure is justified. The Government concludes that the Court may consider Mr. Davenport's actions after Officer Pereira admonished him to "Come here" in deciding whether the attempted stop at the fence was justified. *See* Gov't's Post-Hearing Brief in Opp'n to Mot. to Suppress [doc. #50] at 14-18 (citing *United States v. Swindle*, 406 F.3d 562 (2d Cir. 2005)). The Court agrees. Because the Court finds that Officer Pereira's admonition was reasonable, and

Court explained in *Wardlow*, "Headlong flight – wherever it occurs – is the consummate act of evasion: It is not necessarily indicative of wrongdoing, but it is certainly suggestive of such." 528 U.S. at 124; *see Vargas*, 369 F.3d at 101 (noting that the suspect's "evasive flight" when approached by officers contributed to the reasonable suspicion supporting their *Terry* stop). Officer Pereira loudly said "Come here" to Mr. Davenport, who obviously knew that a police officer wanted to talk with him. Yet, Mr. Davenport ran down several streets and tried to jump a fence to avoid having to do so. Coupled with Mr. Davenport's close match to one of the suspects in the purse snatching, his location at the bank shortly after the purse snatching, and his suspicious behavior and nervous reaction to seeing the police cruiser, Mr. Davenport's flight would "warrant a man of reasonable caution in the belief" that a brief detention of Mr. Davenport was appropriate. In sum, the CAD recordings, Officer Pereira's report, and his testimony demonstrate that he had ample justification to conduct a *Terry* stop at the fence.

Mr. Davenport does not propose any version of events that differs from the one offered by Officer Pereira. However, he does note several "discrepancies" between Officer Pereira's written report and the CAD recordings. In particular, Mr. Davenport stresses four:

> (1) Pereira's report says that the second suspect had a grey army fatigue shirt whereas the radio broadcast stated that the second suspect had a grey army fatigue jacket; (2) Pereira's report says that the first suspect was between 5' 10" and 6' 0" but the broadcast did not give a height for the first suspect and said the second suspect was between 5' 9" and 5' 10"; . . . (3) Pereira's report does not mention that the second suspect had a beard but the broadcast stated that the second suspect had a beard[; and (4)] Pereira's report states that the suspects were wanted for an armed robbery but the dispatch recordings contained no mention that a weapon was involved in the robbery.

---

because, as explained above, Officer Pereira imposed no restraint on Mr. Davenport's freedom until the event at the fence, the Court may consider all events occurring before Officer Pereira sought to stop Mr. Davenport from climbing over the fence and escaping.

Defendant's Reply to Government's Opposition to Motion to Suppress [doc. #26] at 1-2. According to Mr. Davenport, these "discrepancies" "raise questions about the reliability and credibility of Pereira's report." *Id.* at 1; *see also* Defendant's Preliminary Memorandum in Support of Motion to Suppress Evidence [doc. #22-1] at 5 ("In light of these errors, doubt is cast over Pereira's entire report.").

The Court is not persuaded that these purported inconsistencies undermine Officer Pereira's credibility or his reasonable suspicion in making a *Terry* stop. It is unsurprising that Officer Pereira remembered the CAD broadcast as describing the clothing that Mr. Davenport was actually wearing (the grey army fatigue shirt and black jacket), rather than the clothing that the broadcast described (the grey army fatigue jacket), given the similarity between the two descriptions. The difference between a camouflage jacket and a camouflage shirt is not so great as to cast doubt on Officer Pereira's observations and reasons for wanting to speak with Mr. Davenport. *See United States v. Martin*, 157 F.3d 46, 52 (2d Cir. 1998) ("The errors identified by [defendant] were minor and therefore insufficient to defeat probable cause."); *id.* ("'[M]inor errors or inconsistencies [in supporting affidavits do not] undermine the existence of probable cause'" (second alteration in original) (quoting *United States v. Smith*, 9 F.3d 1007, 1014 (2d Cir. 1993))). The fact that Officer Pereira recalled the CAD recording as describing both suspects as being between 5' 10 and 6' 0", when in fact it only described the second suspect, and described him as being between 5' 9" and 5' 10", is also hardly significant. Nor is the fact that Officer Pereira failed to note in his report that the broadcast description mentioned the second suspect as having a beard. Officers are not expected to record all of the minute details of their activities with the type of precision Mr. Davenport demands, particularly when an officer is involved in a fast-developing situation such as that which confronted

Officer Pereira on the evening in question. *See United States v. Sharpe*, 470 U.S. 675, 686 (1985) (noting that a court deciding whether an investigatory stop was proper "should take care to consider whether the police are acting in a swiftly developing situation, and . . . should not indulge in unrealistic second-guessing"). Finally, the report's statement that Officer Pereira was searching "for two suspects wanted for an armed robbery," Gov't Ex. 5, at 1, may not be consistent with the CAD dispatcher's failure to mention any weapon, but it is fully consistent with Officer Pereira's testimony at the hearing that prior to chasing Mr. Davenport, he was aware that a knife had been used in the pursue snatching. And, of course, a knife was in fact used in the purse snatching.

The Court finds credible Officer Pereira's hearing testimony, which largely confirmed the information contained in his contemporaneous police report. Any differences between the CAD recordings and Officer Pereira's recollection of them are certainly too minimal to make the Court doubt other aspects of the report – particularly since Mr. Davenport points to no other specific portions of Officer Pereira's report that he claims to be inaccurate. Therefore, the Court has no reason to doubt its conclusion that Officer Pereira had more than a sufficient basis to conduct a *Terry* stop.

Mr. Davenport argues in the alternative that even if Officer Pereira were warranted in conducting a *Terry* stop, what occurred at the fence between Officer Pereira and Mr. Davenport was not a *Terry* stop but was, instead a "de facto arrest." A de facto arrest occurs when "the totality of circumstances indicates that an encounter has become too intrusive to be classified as an investigative detention." *Posr v. Doherty*, 944 F.2d 91, 98 (2d Cir. 1991). While a *Terry* stop requires only reasonable suspicion of criminal activity, a de facto arrest requires probable cause to believe that a crime has been or is being committed. *See id.*

The Second Circuit has held that "[w]hether a seizure is an arrest or a merely an investigatory detention, depends on the reasonableness of the level of intrusion under the totality of the circumstances." *Id.* To prevent a *Terry* stop from crossing the line into a de facto arrest, officers "must employ 'the least intrusive means reasonably available' to effect their legitimate investigative purposes." *United States v. Newton*, 369 F.3d 659, 674 (2d Cir. 2004) (quoting *Florida v. Royer*, 460 U.S. 491, 500 (1983) (plurality opinion)). Factors bearing on the inquiry include: "(1) the length of time involved in the stop; (2) its public or private setting; (3) the number of participating law enforcement officers; (4) the risk of danger presented by the person stopped; and (5) the display or use of physical force against the person stopped, including firearms, handcuffs, and leg irons." *Newton*, 369 F.3d at 674.

In the Court's view, the Officer Pereira's actions were eminently reasonable under the totality of circumstances he faced. Officer Pereira reasonably suspected Mr. Davenport of being a participant in an armed purse snatching, and Officer Pereira did not know whether Mr. Davenport was still carrying the knife used in the robbery. *See United States v. Vargas*, 369 F.3d 98, 102 (2d Cir. 2004) (noting that because the defendant "was suspected of being armed based on the information provided by the reliable confidential informant . . . he had to be approached with caution"). Furthermore, the degree of restraint applied – Officer Pereira's unsuccessful, bare-handed attempt to pull Mr. Davenport off the fence in order to stop him from escaping – was also quite minimal in the circumstances.[6] Given that Mr. Davenport had fled upon hearing Officer Pereira's

---

[6] Citing *United States v. Swindle*, 407 F.3d 562 (2d Cir. 2005), the Government argues that because Officer Pereira was unsuccessful in stopping Mr. Davenport at the fence, Mr. Davenport "was not actually 'seized' for Fourth Amendment purposes until he was physically apprehended, and, accordingly, the appropriate point from which reasonable suspicion should be measured in this case is the point at which Davenport was ultimately apprehended, at the conclusion of the foot chase."

request to speak to him and that Mr. Davenport had continued to flee even as Officer Pereira chased after him, Officer Pereira was left with the choice of attempting physically to restrain Mr. Davenport so Officer Pereira could speak with him or blithely letting Mr. Davenport disappear among residences. That Officer Pereira chose the former was hardly unreasonable. *See Adams v. Williams*, 407 U.S. 143, 145 (1972) ("The Fourth Amendment does not require a policeman who lacks the precise level of information necessary for probable cause to arrest to simply shrug his shoulders and allow a crime to occur or a criminal to escape. On the contrary, *Terry* recognizes that it may be the essence of good police work to adopt an intermediate response."). In *United States v. Vargas*, for instance, the Second Circuit held that a *Terry* stop did not ripen into a de facto arrest where police approached a suspect who then began to flee, intercepted him, forced him to the ground and handcuffed him, and then patted him down. Because "[the suspect] had demonstrated his unwillingness to cooperate with the officers' investigation by fleeing from them when originally approached and continuing to struggle with [an officer] following the stop," it was reasonable for police to take steps to restrain him. *Id.* The Second Circuit explained that even "intrusive and aggressive police conduct is not an arrest when it is a reasonable response to legitimate safety concerns on the part of the investigating officers." *Id.* (internal quotation marks omitted). Given the

---

Gov't's Post-Hearing Brief in Opp'n to Mot. to Suppress [doc. #50] at 18-19. Though *Swindle* does note that "[the suspect] was not seized until the police physically apprehended him," 407 F.3d at 572, no physical contact occurred between the suspect and police in *Swindle* until the suspect was ultimately taken into police custody; before that point, police had only activated their sirens, followed his car, and chased him on foot. Therefore, the Second Circuit in *Swindle* had no occasion to consider whether police seize a suspect when they physically restrain him in an unsuccessful attempt to stop his flight. *Cf. California v. Hodari D.*, 499 U.S. at 626 ("The word 'seizure' readily bears the meaning of a laying on of hands or application of physical force to restrain movement, even when it is ultimately unsuccessful."). Because the Court finds that Officer Pereira's actions at the fence were reasonable, it need not, and does not, rely on *Swindle* in the manner urged by the Government.

circumstances, nothing in the Fourth Amendment required Officer Pereira to sit idly by and watch a suspect in an armed robbery scale a fence and escape into a neighborhood.

Nevertheless, Mr. Davenport claims that "courts have held that de facto arrests occurred where police used comparable or less intrusive means of effectuating the seizure of suspects." Def.'s Post-Hearing Mem. in Support of Mot. to Suppress [doc. #51] at 6. The cases Mr. Davenport cites, however, do not support this claim. In *Posr v. Doherty*, 944 F.2d 91 (2d Cir. 1991), for instance, witnesses testified that the alleged de facto arrestee was a peaceful protestor who was not fleeing from, but rather was taking steps towards, an officer at the time the officer approached him. *Id.* at 94. The suspect testified that the police officer "took physical control of [the suspect] and 'slammed' him against a wall while exclaiming 'assaulting a police officer, you are dead.'" *Id.* at 99. Another witness testified that the officer "landed" approximately twenty blows on the arrestee. *Id.* at 94. In those circumstances, the Second Circuit concluded that sufficient evidence existed to allow a jury to decide whether a de facto arrest had taken place. *Id.* at 99. The degree of force in *Posr* was clearly far greater, and the justification for the officer's actions far less, than in the present case.

The other cases that Mr. Davenport cites all involve situations in which the police were successful in completely restraining the suspect's freedom of movement, and all involve a greater display of force than occurred here. *See United States v. Moreno*, 897 F.2d 26, 29, 31 (2d Cir. 1990), *abrogated on other grounds by Ruggiero v. Krzeminski*, 928 F.2d 558 (2d Cir. 1991) (finding a de facto arrest where two officers detained the suspect and questioned him, and one officer "turned [the suspect] around, put his chest against the wall of the vestibule and told him: '[S]tand there and don't move'"); *United States v. Marin*, 669 F.2d 73, 81-82 (2d Cir. 1982) (finding a de facto arrest where "three or four DEA cars block[ed] [the suspect's car's] forward progress," "agents rapidly surrounded

the [car] with their guns drawn, . . . at least two of the occupants of the car were physically removed from the car by the agents," and "as [the suspect] was being frisked, [he] tried to walk away and was physically restrained by [an agent]"); *United States v. Ceballos*, 654 F.2d 177, 184 (2d Cir. 1981) (finding a de facto arrest where officers surrounded the suspect's car with at least three police cars and, with guns drawn, ordered him out of his car, despite the fact that the suspect "was not known to be armed or reasonably suspected of being armed"); *United States v. Campbell*, 959 F. Supp. 606, 612 (W.D.N.Y. 1997) (finding a de facto arrest where the suspect's vehicle was "boxed in" by police cars, "six vehicles containing thirteen law enforcement officers [were] in the immediate vicinity of the stop," several officers had drawn their weapons, and the suspect was "forcibly removed . . . from his vehicle and placed . . . face down on the pavement"); *United States v. Killiam*, No. 86 CR. 702, 1989 WL 122886, at *4 (S.D.N.Y. Oct. 11, 1989) (finding a de facto arrest where "[t]he van in which [the suspect] was sitting was surrounded by approximately five possibly armed officers," one of whom "had his gun drawn" and "physically pulled [the suspect] from the van and put him against it"). Here, by contrast, Officer Pereira was obviously not successful in completely restraining Mr. Davenport's freedom, he did not use his weapon, and his actions in the circumstances were reasonably restrained.

Therefore, the cases cited by Mr. Davenport do not undermine the Court's conclusion that Officer Pereira's actions at the fence were reasonable and appropriate. The Court thus rejects Mr. Davenport's argument that Officer Pereira's unsuccessful attempt to pull Mr. Davenport from the fence as he was escaping constituted a de facto arrest. Here, Officer Pereira's actions were more akin to an investigatory detention, and he had ample suspicion to support such a brief detention. Because the Court finds that Officer Pereira's efforts to detain Mr. Davenport were reasonable, it follows that

police lawfully seized the gun and bullets Mr. Davenport discarded after Officer Pereira's attempted detention failed and Mr. Davenport continued to flee.

**B. The Bullet Found on Mr. Davenport**

The final issue for the Court to consider is whether police lawfully seized the bullet found on Mr. Davenport's person when he was arrested and taken into custody on Iranistan Ave. Mr. Davenport concedes that the validity of his arrest and the search incident to his arrest – in which the bullet was seized – turn on the legality of Officer Pereira's actions at the fence. Def.'s Prelim. Mem. in Support of Mot. to Suppress Evidence [doc. #22-1] at 12 (noting that "*if* the gun is suppressed as tainted by the unlawful seizure at the fence, the ammunition allegedly found in Mr. Davenport's pocket during a search incident to his arrest must also be suppressed," because "*[a] bsent the gun*, the police lacked probable cause for Mr. Davenport's arrest") (emphasis added). That is, Mr. Davenport acknowledges that if police could properly rely on the fact that he had withdrawn a handgun from his waistband and discarded it while fleeing Officer Pereira, that information would support a finding of probable cause sufficient to justify Mr. Davenport being taken into custody on Iranistan Ave. And Mr. Davenport does not complain that the search of his person after being taken into custody was beyond the scope of a lawful search incident to an arrest, if that arrest were lawful. *See id.*

Because the Court has already concluded that Officer Pereira acted lawfully in attempting to detain Mr. Davenport at the fence, the Court holds that there was probable cause to arrest him when officers finally took him into custody on Iranistan Ave., and that the bullet on Mr. Davenport's person was found in a search incident to that lawful arrest.

**III.**

In sum, the Court finds that the gun and ammunition found by police were lawfully seized and therefore DENIES Mr. Davenport's Motion to Suppress Evidence [doc. #21].

IT IS SO ORDERED,

/s/ Mark R. Kravitz
United States District Court

**Dated at New Haven, Connecticut: December 15, 2005.**